AL ROGERS, an Individual, and PENNY ROGERS, an Individual, both dba BIG AL'S GOOD TIME PIZZA AND STUFF, a Sole Proprietorship; JOHN PESHEK, dba PIP PRINTING, a Sole Proprietorship; HOWARD ZINK, dba MR. ROY PRODUCTIONS, a Sole Proprietorship; WESLEY FLETCHER, dba FLETCHER ROOFING & SIDING, a Sole Proprietorship; RONALD TROMBLY, dba RON TROMBLY CONSTRUCTION, INC., a Sole Proprietorship; SHELLY SWANSON, dba SWANSON AND SON LAWN SERVICE, a Sole Proprietorship; MERL SCHNEIDER, dba DAIRY QUEEN 1, a Sole Proprietorship; RAY TOMALAS, dba R.L. TOMALAS CUSTOM CABINETS, a Sole Proprietorship; DARYL REEDY, an Individual Doing Business as a Sole Proprietorship; STEVE BROWN, an Individual; THE CARSON CIGAR COMPANY, INC., a Nevada Corporation; KAY MEDRANO, RAY AND KAY, INC., a Nevada Corporation; LYNN GARD, an Individual; BACK TO THE GRIND, INC., a Nevada Corporation; JAMES L. CARPENTER, an Individual; ANDY JENSEN, an Individual; ANTHONY P. DIEHL, an Individual; JEFF SLIGAR, an Individual; CARL J. DERICCO, an Individual; THE TOWN BARBERS, a Nevada Limited Liability Corporation; CARSON CITY CHAMBER OF COMMERCE, a Nevada Corporation; DAYTON AREA CHAMBER OF COMMERCE, a Nevada Corporation; DOUGLAS COUNTY CHAMBER OF COMMERCE, a Nevada Corporation; ELKO COUNTY CHAMBER OF COMMERCE, a Nevada Corporation; GREATER RENO-SPARKS CHAMBER OF COMMERCE, a Nevada Corporation; GREATER LAS VEGAS CHAMBER OF COMMERCE, a Nevada Corporation; ASSOCIATED GENERAL CONTRACTORS OF AMERICA, a Nevada Not-for-Profit Corporation; NEVADA ASSOCIATION OF EMPLOYERS, a Nevada Not-for-Profit Corporation; and NEVADA TAXPAYER'S ASSOCIATION, a Nevada Not-for-Profit Corporation, Appellants, v. DEAN HELLER, in His Official Capacity as SECRETARY OF STATE OF THE STATE OF NEVADA; and NEVADA STATE EDUCATION ASSOCIATION, a Nevada Non-Profit Cooperative Corporation, Respondents.

No. 37189

February 27, 2001                                18 P.3d 1034

*McMullen Strategic Group* and *Samuel P. McMullen,* Reno, for Appellants.

*McDonald Carano Wilson McCune Bergin Frankovich & Hicks LLP,* Reno, for Appellants.

*Frankie Sue Del Papa,* Attorney General, and *Kateri M. Cavin,* Deputy Attorney General, Carson City, for Respondent Secretary of State.

*Dyer Lawrence Cooney & Penrose,* Carson City, for Respondent Nevada State Education Association.

*Schreck Brignone & Godfrey* and *Todd L. Bice* and *Michael V. Infuso,* Las Vegas, for Amicus Curiae Nevada Resort Association.

*Sinai Schroeder Mooney Boetsch & Bradley,* Reno, for Amicus Curiae Nevada Parent-Teacher Association.

*Brenda J. Erdoes,* Legislative Counsel, Carson City, for Amicus Curiae Legislative Commission.

*Allison MacKenzie Hartman Soumbeniotis & Russell,* Carson City, for Amici Curiae Nevada Manufacturers Association, Nevada Cattleman's Association, Nevada Motor Transport Association and Retail Association of Nevada.

*McCracken Stemerman Bowen & Holsberry,* Las Vegas, for Amici Curiae Nevada State AFL-CIO & Culinary Workers Union Local 226.

# OPINION

*Per Curiam:*

In this appeal, we are asked to address the propriety of an initiative petition ("Initiative") that seeks to raise funds and increase state funding for Nevada's public elementary and secondary schools by enacting a new chapter in NRS Title 32 and by amending various provisions of Nevada's statutes. Because the Initiative requires a new legislative appropriation without also raising a sufficient tax, it lacks sufficient funding, a threshold requirement under the Nevada Constitution. The Initiative's failure to comply with the Nevada Constitution's threshold funding renders it void. Further, as the Initiative is void, the Secretary of State's transmittal of the Initiative to the Legislature was ineffective, and the Legislature is barred from taking further action on it.

## The Initiative

In April 2000, respondent Nevada State Education Association ("NSEA") filed the Initiative with respondent Nevada Secretary

of State. The Initiative is entitled "Nevada Tax Fairness and Quality School Funding Accountability Act," and would amend the Nevada Revised Statutes by adding a new chapter to Title 32, Revenue and Taxation, and amending various statutes, basically for the purpose of increasing funding to Nevada's public schools, grades K-12. The Initiative was circulated for signatures and signed by more than 63,000 voters throughout the state. Thereafter, various county clerks and registrars of voters verified the signatures on the Initiative documents. On September 25, 2000, the Secretary of State certified that the Initiative had qualified for submission to the Nevada Legislature.

On October 2, 2000, appellants, numerous business entities, filed a complaint in the district court pursuant to NRS 295.061. The complaint sought declaratory and injunctive relief, or in the alternative, writ relief in the form of mandamus or prohibition. The complaint raised two general challenges to the Initiative: (1) constitutional deficiencies in the substance of the Initiative, and (2) procedural deficiencies in the Initiative's qualification process. NSEA opposed the complaint.

Following a five-day trial, the district court issued an order denying the relief requested by appellants. The district court determined that the Initiative should be read to mean that the tax raised is intended to supplement the general amount of funding the schools presently receive from all sources, and thus the Initiative is not clearly unconstitutional. This appeal followed.

## Background on the initiative process

Nevada's Constitution expressly empowers the people to propose, by initiative petition, statutes and amendments to statutes;[1] it requires the Secretary of State to transmit a certified initiative petition to the Legislature as soon as the Legislature convenes.[2] Thereafter, the Legislature must enact or reject the proposed initiative petition without change or amendment within forty days.[3] If the Legislature fails to act within the forty days, or rejects the initiative petition, then the Secretary of State must submit the initiative petition to the electorate for a vote at the next general election.[4] If approved, the Legislature cannot amend, annul, repeal, set aside or suspend the law within three years after it takes effect.[5]

---

[1]Nev. Const. art. 19, § 2(1).

[2]Nev. Const. art. 19, § 2(3).

[3]*Id.*

[4]*Id.*

[5]*Id.*

*The Initiative's funding*

■

Nevada Constitution article 19, section 2(1) provides that the initiative process is "subject to the limitations of [article 19, section 6]." Article 19, section 6, in turn, "does not permit the proposal of any statute or statutory amendment which makes an appropriation or otherwise requires the expenditure of money, unless such statute or amendment also imposes a sufficient tax, not prohibited by the constitution, or otherwise constitutionally provides for raising the necessary revenue." Section 6 applies to *all* proposed initiatives, without exception, and *does not permit* any initiative that fails to comply with the stated conditions. Consequently, section 6 is a threshold content restriction, under which we must address the Initiative's validity.[6] If the Initiative does not comply with section 6, then the Initiative is void.[7] Thus, we must first determine if the Initiative makes an appropriation or requires an expenditure of money. Simply stated, an appropriation is the setting aside of funds, and an expenditure of money is the payment of funds.[8]

Historically, Nevada's Legislature has provided for the general support of schools every year. In 1873, a state school fund was established, and interest accrued from the revenue raised from selling land was divided among Nevada's elementary and secondary schools.[9] In 1912, the state distributive school account was established, with funds distributed to schools semiannually.[10] Since then, the Legislature has resolved that state financial aid to

---

[6]*See Caine v. Robbins,* 61 Nev. 416, 420, 131 P.2d 516, 517 (1942) (determining that an initiative that lacked an enabling clause—a threshold constitutional requirement—renders the initiative void); *see also* James D. Gordon, III, and David B. Magleby, *Pre-election Judicial Review of Initiatives and Referendums,* 64 Notre Dame L. Rev. 298, 313-14 (1989); John F. Cooper, *The Citizen Initiative Petition to Amend State Constitutions: A Concept Whose Time Has Passed, or a Vigorous Component of Participatory Democracy at the State Level?,* 28 N.M. L. Rev. 227, 241 (1998).

[7]*See Caine,* 61 Nev. at 420, 131 P.2d at 517.

[8]*See Black's Law Dictionary* 101 (6th ed. 1990) (defining "appropriation" as the "act of appropriating or setting apart; . . . designating the use or application of a fund"); *id.* at 577 (defining "expenditure" as the "[s]pending or payment of money; the act of expending, disbursing, or laying out of money"); *see also McAlpine v. University of Alaska,* 762 P.2d 81, 88 (Alaska 1988) (noting that a typical appropriation involves setting aside money); *Hunt v. Callaghan,* 257 P. 648, 649 (Ariz. 1927) (defining an appropriation as "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other") (quotation omitted).

[9]*See* NV Compiled Laws, § 3320.

[10]*See* NV Compiled Laws, § 3375.

public schools, grades K-12, is intended to provide each child in Nevada with a reasonably equal education opportunity.[11] To accomplish this objective, the Legislature establishes "basic support guarantees" for all school districts.[12] These guarantees are based upon a set and equal amount of funding for each student in all school districts. Both state and local revenues contribute to the total basic support guarantees for all districts.[13] After the Legislature determines how much money each local school district can apply toward its total per-student basic support guarantees, the state makes up the difference between the amount of the district's total basic support guarantees and the district's available local funding.[14] This arrangement is known as the "Nevada Plan," and the state's share, the total amount of its contribution for all districts, is drawn from the state distributive school account.[15] Based on the Nevada Plan, the Legislature approves a budget for the state distributive school account for the state's portion of overall education funding.

Section 53 of the Initiative would require the Legislature to set the amount of the basic support guarantees each biennium so that the state's share equals at least fifty percent of the state's total projected revenues:

> 1.  For making the apportionments of the state distributive school account in the state general fund required by the provisions of this Title, the basic support guarantee per pupil for each school district and the basic support guarantee for each special education program unit maintained and operated during at least 9 months of a school year [ ] must be established by law for each school year. *For each year of the biennium, the basic support guarantees must be established in such amounts so that collectively, after deducting local money available for public schools, they represent not less than 50 percent of the projected revenue of the state for that year.*
>
> 2.  As used in this section:
>
> (a) "Local money available for public schools" means the

[11]*See* NRS 387.121.

[12]NRS 387.122.

[13]*See* NRS 387.121.

[14]*See id.*; NRS 387.1235. If a school district's available local revenues exceed the amount of basic support, no appropriation will be made by the state to that school district. *See* NRS 387.124.

[15]NRS 387.121. The record shows that the state distributive school account derives its funding from the general fund appropriation under the state budget, from annual slot tax revenues, investment income, mineral land lease revenues, out-of-state sales tax, and estate tax revenues. *See also* NRS 387.030.

sum of the amounts referred to in paragraphs (a) and (b) of subsection 1 of NRS 387.1235.

(b) "Projected revenue of the state" means the amount of revenue to be collected by the state during each year of the biennium, as estimated by the economic forum pursuant to NRS 353.228.

3. All money received pursuant to sections 5 to 44, inclusive, of this measure *must be appropriated* and expended only for the purposes provided for in section 14 of this measure, and must be used only to supplement sources of funding for education existing on the effective date of this measure and not as a substitute for existing funding for education. No money in the quality schools trust account in the state distributive school account may be used to supplant any state or local general fund [money for] any purpose.[16]

To help pay for this fifty-percent amount, the Initiative proposes to levy a four-percent tax on the Nevada taxable income of each business operating in Nevada to the extent the income exceeds $50,000.00 annually. The Initiative also provides that the amount raised from the four-percent tax would only supplement the state's sources of funding for education and is not intended as a substitute for existing education funding. Moreover, the Initiative provides that the revenue from the four-percent tax would only be available to fund education.

The Initiative proposes fundamental changes to the budget for Nevada's public elementary and secondary schools. Under the Initiative, the amount of funding allocated for the state's share of the school districts' basic support guarantees cannot be less than fifty percent of the state's total projected revenues for each year of a given biennium. It requires the basic support guarantees to be set in an amount so that they equal half of the state's projected general fund revenue after deducting local money available for public schools. Accordingly, the Initiative calls for an appropriation and an expenditure: it requires the Legislature to appropriate and spend a specific amount of money for a specified purpose for all future biennia. Additionally, since the Initiative sets the appropriation amount at a minimum of fifty percent of the state's total revenues, it prevents the Legislature from setting or diminishing the amount of funding.

Although NSEA argues that the Initiative's plain language provides that it is meant to augment, and not supplant, existing funding, NSEA fails to recognize that the Legislature is under no continuing obligation to fund education in any particular amount.

---

[16]Initiative, section 53(1)-(3) (emphasis in subsections 2 and 3 omitted except for "must be appropriated").

Currently, the Legislature decides what amount to appropriate for public education each biennium, based in part on a determination of the basic support guarantees, and in part on local funding for public schools. Even if the Legislature has a perpetual duty to fund education, because of its traditional role in funding education and its promise to pay any needed portion of the basic support guarantees, the Legislature is not required to continue funding education at any particular level. A necessary appropriation or expenditure in *any* set amount or percentage is a new requirement that otherwise does not exist. Thus, although the Initiative is intended to supplement current education funding, by requiring the state's share of the basic support guarantees to be an amount that is at least half of the state's total projected general revenue, the Initiative requires a new appropriation and expenditure in at least the fifty-percent amount for each biennium. The entire amount is a new requirement, since otherwise the Legislature has broad discretion in determining education funding.

Therefore, since the Initiative requires a new appropriation and expenditure, we must decide whether the proposed four-percent tax under the Initiative covers the required amount. We have not previously considered what funding is necessary when an initiative requires an appropriation or the expenditure of money. Nevada Constitution article 19, section 6 states that the initiative must impose ''a sufficient tax . . . or otherwise constitutionally provide[ ] for raising the necessary revenue.'' We must give this provision its plain meaning unless the language is ambiguous.[17] Here, the language at issue is clear—the Initiative must create enough tax or revenue to cover its required appropriation and expenditure.

Although proposed taxes and revenues are subject to projections and may not be calculable to a certainty, the proposed tax here is clearly insufficient to cover the Initiative's required fifty-percent-of-revenue appropriation. NSEA's Director of Research testified that the four-percent tax proposed under the Initiative could generate approximately $270,000,000 annually. This amount would arguably be sufficient to fund an increase between the average

---

[17]*See McKay v. Bd. of Supervisors,* 102 Nev. 644, 648, 730 P.2d 438, 440 (1986). A majority of courts apply the rules of statutory construction when interpreting constitutional provisions. *See, e.g., State Bd. of Equalization v. Bd. of Supervisors,* 164 Cal. Rptr. 739 (Ct. App. 1980); *Westerberg v. Andrus,* 757 P.2d 664 (Idaho 1988); *Butte-Silver Bow Local Gov't. v. State,* 768 P.2d 327 (Mont. 1989); *Com'n on Medical Competency v. Racek,* 527 N.W.2d 262, 266 (N.D. 1995). We agree that the rules of construction that apply to statutes should also be applied to constitutional provisions.

percentage of the state's overall revenues spent on education in the past, and the Initiative's fifty-percent-of-revenues requirement, but only if the Legislature, in its discretion, kept education funding the same. This amount, in and of itself, falls far short of the total fifty-percent requirement.[18] Consequently, the Initiative fails the threshold-funding requirement of article 19, section 6.

*Severability*

NSEA asks that if the Initiative's appropriation requirement is constitutionally infirm, we sever that provision and allow the rest of the Initiative to proceed.[19] According to NSEA, the invalid provision can be stricken because the Initiative's drafters intended that the tax revenues raised should supplement existing education funding, and severing section 53 would accomplish this goal.

"Severability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions."[20] We have previously recognized the doctrine,[21] and, as our dissenting colleague notes, NRS 0.020 deals expressly with severability. This statutory provision, however, relates specifically to provisions of the Nevada Revised Statutes, laws that have been formally adopted. Although severance may be appropriate with respect to the Nevada Revised Statutes, we decline to sever an initiative petition's central component that has been signed by thousands of voters.[22] Initiative petitions must be kept substantively intact; otherwise, the people's voice would be obstructed. As the California Court of Appeals observed nearly a century ago:

---

[18]The state's revenue for fiscal years 1999-2000 was estimated at approximately $1.5 billion annually.

[19]Section 55 of the Initiative sets forth a severability clause:

> If any provision of this measure or its application to any person or circumstance is held invalid, that invalidity shall not affect any other provision or application of this measure that can be given effect without the invalid provision or application. As used in this section, "provision" includes any section, subsection, paragraph, subparagraph, sentence, phrase or word of this measure.

[20]*Ray v. Mortham,* 742 So. 2d 1276, 1280 (Fla. 1999).

[21]*Brewery Arts Ctr. v. State Bd. Examiners,* 108 Nev. 1050, 843 P.2d 369 (1992); *County of Clark v. City of Las Vegas,* 92 Nev. 323, 550 P.2d 779 (1976).

[22]*In Nevada Judges Association v. Lau,* 112 Nev. 51, 910 P.2d 898 (1996), we severed an initiative petition that proposed a constitutional amendment and ordered it presented as two questions instead of one. In that case, however, our decision to sever the initiative petition into two questions did not change the petition's substance.

> Here is a power granted unto the people, to propose their own laws for adoption, provided certain legal procedure be followed to properly place said laws before the voters. Assume, if you please, that certain features are included in such proposed laws or in connection therewith, which appealed to the voter, and in fact served as the controlling influence inducing him to sign the petition. Has he not the right to assume, and should not the law protect him in the assumption, that he will have the opportunity and right to vote for the matters which he has petitioned for? . . . In fact, is not the whole theory of initiative legislation based upon the security that the legislation proposed and petitioned for by the people shall be voted upon at the polls by them without interference, revision, or mutilation by any official or set of officials?[23]

We agree that initiative legislation is not subject to judicial tampering—the substance of an initiative petition should reflect the unadulterated will of the people and should proceed, if at all, as originally proposed and signed. For this reason, our constitution prevents the Legislature from changing or amending a proposed initiative petition that is under consideration. Like the Legislature, we are not in a position to know whether an initiative's drafters and signers would want an initiative to proceed without a primary component of the proposal. Consequently, in this case, we decline to sever section 53 from the Initiative.

Appellants have raised other issues with respect to the Initiative's constitutionality and procedural compliance, but we need not address these issues. Since the Initiative fails to comply with article 19, section 6 of the Nevada Constitution, it is void. Accordingly, we reverse the order of the district court. Further, as we have determined that the Initiative is void, the Secretary of State's transmittal of the Initiative to the Legislature was ineffective. Although the Legislature is barred from taking further action on the void Initiative, nothing in this opinion is to be construed as precluding the Legislature from considering or adopting the same or similar legislation as it may deem appropriate.[24]

ROSE, J., dissenting:

I dissent because our intervention in the initiative petition process at this time is premature and not appropriate. But even if

---

[23]*Bennett v. Drullard,* 149 P. 368, 370 (Cal. Ct. App. 1915).

[24]THE HONORABLE A. WILLIAM MAUPIN, Chief Justice, and THE HONORABLE NANCY A. BECKER, Justice, did not participate in the decision of this appeal.

In light of the nature and urgency of this matter, we suspend NRAP 41(a) and direct the clerk of this court to issue the remittitur forthwith.

intervention were appropriate, I believe that the basic business tax proposal is severable from the provision that would require the Legislature to spend on education at least fifty percent of the state's revenue.

Our case law instructs us that we should not intervene at this early stage of the initiative petition process unless the petition "would constitute a 'plain and palpable' violation of the . . . Constitution and would 'inevitably be futile and nugatory and incapable of being made operative under any conditions or circumstances.' "[1] The rationale behind the rule is simple: the initiative process should continue and not be derailed by judicial intervention unless the petition proposal is clearly and obviously unconstitutional.[2] The business tax petition is certainly not that. It presents close legal issues with few helpful precedents to aid us.

In oral argument, JUSTICE CLIFF YOUNG insightfully inquired: "Why should we get involved at all? Why shouldn't we wait until the initiative petition process has run its course?" First impressions are almost always valid when buttressed by the law. Abstaining from action at this time is the legal and thoughtful thing to do and constitutes a preferred conservative approach to judicial involvement in the initiative petition process.

The majority believes that the petition's requirement that the Legislature maintain educational spending at present levels runs afoul of article 19, section 6 of the Nevada Constitution. I doubt that it does. The proposal requires the Legislature to spend at least fifty percent of the state's budget on education. The majority of funds for this expense are already raised by the state when the Legislature convenes every other year. At trial, the petition's proponents introduced evidence that the petition's tax would raise sufficient revenue to bring this funding to the fifty-percent level. Additionally, because the petition simply requires the Legislature to spend at least fifty percent of state revenues, funding is available; the revenues to comply with the mandatory minimum spending requirement are already on hand, and thus there is no need to identify a revenue source. It appears that the majority is objecting to the reduction of legislative discretion to spend money as it wishes, rather than to the lack of sufficient available revenues.

[1]*Stumpf v. Lau,* 108 Nev. 826, 831, 839 P.2d 120, 123 (1992) (quoting *Caine v. Robbins,* 61 Nev. 416, 425, 131 P.2d 516, 520 (1942)).

[2]This court explained its wait-and-see policy in *Las Vegas Chamber of Commerce v. Del Papa,* 106 Nev. 910, 917, 802 P.2d 1280, 1281-82 (1990): "First, a measure that initially appears unconstitutional may be implemented in a constitutional manner. Second, even if an initiative measure is unconstitutional, there is great political utility in allowing the people to vote on the measure. Such a vote communicates clearly to the representative branches of government the popular sentiment on a particular issue or issues."

While a legitimate concern, curbing legislative discretion does not violate this constitutional provision if sufficient revenues are available to comply, as they are in this case.

The initiative process is a power reserved by the people.[3] Accordingly, liberal construction of a proposed initiative is called for, and any doubts should reasonably be resolved by the court in favor of this reserve power.

> The exercise of initiative and referendum is one of the most precious rights of our democratic process. Since under our theory of government all the power of government resides in the people, the power of initiative is commonly referred to as a "reserve" power and it has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, our courts will preserve it.[4]

As I read the majority opinion, any initiative petition that requires the Legislature to fund any project without identifying an independent revenue source will be unconstitutional. This holding gives a strict construction to an initiative petition that should instead be liberally interpreted to preserve the will of the petitioners if at all possible.

I also note that the opponents to the petition did not challenge the constitutionality of the provision that requires a minimum mandatory percentage of the state budget to be spent on education until oral argument before this court. The argument was not made before the district court, and the district court judge was not given a chance to rule on the issue. The district court was faced solely with determining whether the proposed tax would bring the state's prior education funding to the fifty-percent level. Further, the argument was not even made in the appellants' briefs to this court. A legal argument not made in district court is deemed waived and cannot be raised on appeal.[5] Therefore, the opponents to the petition should be precluded from relief on this issue if we follow our precedents regarding appellate review. This is yet another reason why we should not be entertaining this argument against the petition at this time.

But even if we are going to rule on the validity of the petition at this early date and conclude that the provision requiring mandatory spending on education is unconstitutional, the provision is

---

[3]Nev. Const. art. 19, § 2.

[4]*Mervynne v. Acker,* 11 Cal. Rptr. 340, 344 (Ct. App. 1961) (citations omitted).

[5]*See Dermody v. City of Reno,* 113 Nev. 207, 210, 931 P.2d 1354, 1357, (1997); *Powers v. Powers,* 105 Nev. 514, 516, 779 P.2d 91, 92 (1989).

clearly severable from the business tax proposition for the following reasons:

1. The petition itself requests that if any section is invalid, then the remaining valid portions be placed on the ballot. There can be little doubt of the individual signers' intent when the signed petition requests severance of any invalid section.

2. The petition sponsors requested at oral argument that if the mandatory education spending proposal was ruled invalid, the business tax proposal alone be placed on the ballot. I do not see how the majority cannot discern the intent of the sponsors and petition signers when the drafters expressly request severance.

3. NRS 0.020(1) unequivocally states that the invalid portion of an initiative petition ''shall not affect'' the remaining provisions if the other valid provisions can be given effect. Nevada law thus directs that the valid portions of an initiative petition should survive and be placed on the ballot.

4. The business tax is the primary part of the initiative. The obvious intent of the petition is to supplement existing funding for education. This proposal can stand alone, just as it has in other states.

Many states have severed an invalid portion of an initiative petition after it was enacted into law.[6] One state has severed the invalid portion of an initiative petition before it went to the voters.[7] Indeed, the Nevada Supreme Court has gone so far as to modify the language of an initiative petition to meet a constitutional challenge before it went to the voters.[8] In another case, this court severed judges from other elected officials in the term limits proposal that was voted on in 1996.[9] If the mandatory educational spending provision is invalid, this court has the power and

---

[6]*See, e.g., Citizens Clean Elections Commission v. Myers,* 1 P.3d 706 (Ariz. 2000) (severing provision of electorate-adopted initiative that unconstitutionally expanded the scope of judicial appointments and violated doctrine of separation of powers); *U.S. Term Limits, Inc. v. Hill,* 872 S.W.2d 349 (Ark. 1994) (severing unconstitutional amendment as to federal legislative candidates); *Legislature v. Eu,* 816 P.2d 1309 (Cal. 1991) (severing unconstitutional portion of citizen-initiated term-limit legislation); *Ray v. Mortham,* 742 So. 2d 1276 (Fla. 1999) (severing portion of citizen-initiative legislation that attempted to impose term-limits on federal legislators); *Simpson v. Cenarrusa,* 944 P.2d 1372 (Idaho 1997) (severing citizen-initiative legislation that attempted to impose term limits on federal legislators); *State v. Shumway,* 607 P.2d 191 (Or. Ct. App. 1980) (severing legislative amendment that established 25-year minimum incarceration period for persons convicted of murder).

[7]*See McAlpine v. University of Alaska,* 762 P.2d 81 (Alaska 1988).

[8]*See Choose Life Campaign '90' v. Del Papa,* 106 Nev. 802, 804, 801 P.2d 1384, 1385 (1990).

[9]*See Nevada Judges Ass'n v. Lau,* 112 Nev. 51, 60, 910 P.2d 898, 904 (1996).

obligation, pursuant to NRS 0.020(1), to declare the business tax proposal severable from the mandatory spending requirement and permit the business tax proposal to go forward in the initiative process.

The business tax proposal, standing alone, certainly appears to be constitutional. It will raise substantial sums if its hefty four-percent tax on business profits over $50,000 is ever levied. Therefore, the business tax proposal standing alone is not in violation of article 19, section 6 of the Nevada Constitution because it would merely mandate that any funds raised be allocated to Nevada's public primary and secondary schools.

If we are true to the law, we should eschew ruling on the initiative petition's validity at this early stage. These close legal issues will still be there if the petition proposal is enacted into law. For this reason, I dissent from the majority.