NEVADA MINING ASSOCIATION, a NEVADA NON-PROFIT CORPORATION, INCLUDING MEMBERS SUCH AS BARRICK GOLDSTRIKE, INC.; NEWMONT MINING CORPORATION; ANGLOGOLD CORP.; PLACERDOME U.S., INC.; KENNECOTT RAWHIDE MINING COMPANY; NEVADA RESORT ASSOCIATION, a NEVADA NON-PROFIT CORPORATION; MGM–MIRAGE, a NEVADA CORPORATION; SIERRA PACIFIC RESOURCES; NEVADA POWER COMPANY; SIERRA PACIFIC POWER COMPANY; NEVADA BELL TELEPHONE COMPANY; CENTRAL TELEPHONE COMPANY–NEVADA, DBA SPRINT OF NEVADA; AND DEAN A. RHOADS, NEVADA SENATOR FROM NORTHERN DISTRICT, PETITIONERS, v. BRENDA ERDOES, LEGISLATIVE COUNSEL BUREAU, RESPONDENT.

No. 38039

NEVADA ASSOCIATION OF COUNTIES, a NEVADA NON-PROFIT CORPORATION; AND NEVADA ASSOCIATION OF COUNTY CLERKS AND COUNTY ELECTION OFFICIALS, a NEVADA NOT-FOR-PROFIT CORPORATION, PETITIONERS, v. BRENDA ERDOES, LEGISLATIVE COUNSEL BUREAU, RESPONDENT.

No. 38053

July 17, 2001                                     26 P.3d 753

of the bar our resolve to end . . . lackadaisical practices . . . and to enforce the Nevada Rules of Appellate Procedure.''

*Wadhams & Akridge,* Las Vegas, for Petitioner Newmont Mining Corporation.

*Ann C. Pongracz,* Las Vegas, for Petitioner Central Telephone Company-Nevada, dba Sprint of Nevada.

*Sierra Pacific Resources,* Reno, *William E. Peterson,* General Counsel, Reno, for Petitioners Sierra Pacific Resources, Sierra Pacific Power Company, and Nevada Power Company.

*Lionel Sawyer & Collins* and *Rory J. Reid, E. Leif Reid* and *Harvey Whittemore,* Reno, for Petitioners Nevada Mining Association, MGM-Mirage, Nevada Bell Telephone Company, and Dean A. Rhoads.

*Andrew A. List,* Carson City, for Petitioners Nevada Association of Counties, and Nevada Association of County Clerks and County Election Officials.

*Brenda J. Erdoes,* Legislative Counsel, and *Kevin C. Powers,* Principal Deputy Legislative Counsel, Carson City, for Respondent.

## OPINION

By the Court, SHEARING, J.:

The Nevada Constitution requires the Legislature to adjourn its regular session "not later than midnight Pacific standard time 120 calendar days following its commencement," and deems any action taken after the deadline void unless it is taken during a special session. The Nevada Legislature commenced its 71st session on Monday, February 5, 2001, and took its final action on Assembly Bills No. 94 and No. 661 on Tuesday, June 5, 2001, between midnight and 1:00 a.m. Pacific daylight saving time. The question presented by these writ petitions is whether the legislative action was constitutional. We conclude that it was, because midnight Pacific standard time (PST) is equivalent to 1:00 a.m. Pacific daylight saving time (PDST); thus, the Legislature's final action on the bills was taken before the constitutional deadline and the bills must be enrolled and delivered to the Governor.

### FACTS

*Docket No. 38039*

Assembly Bill No. 661 was introduced and read for the first time in the Assembly on March 26, amended on May 22, and passed as amended on May 23, 2001. A.B. 661 was then introduced and read for the first time in the Senate on May 24, amended on May 30 and again on June 4, and finally passed as amended at 11:57:50 p.m. PDST on June 4, 2001 (10:57:50 p.m.

(PST)). A.B. 661 was returned to the Assembly, which concurred with the Senate's three amendments to A.B. 661 at 12:24:17 a.m., 12:25:15 a.m. and 12:25:47 a.m. PDST on June 5, 2001 (11:24:17 p.m., 11:25:15 p.m. and 11:25:47 p.m. PST on June 4, 2001).

Thereafter, Brenda Erdoes of the Legislative Counsel Bureau declined to enroll A.B. 661 and did not deliver the bill to the Governor for his action.

On June 15, 2001, the Nevada Mining Association, several mining companies, the Nevada Resort Association, a casino resort, several power and telephone companies, and Senator Dean Rhoads filed an original petition for a writ of mandamus (docketed as No. 38039) to compel Legislative Counsel to fulfill her constitutional and statutory duties to enroll A.B. 661 and deliver the bill to the Governor for his action.

*Docket No. 38053*

Assembly Bill No. 94 was introduced and read for the first time in the Assembly on February 12, amended on April 20, and passed as amended on May 23, 2001. A.B. 94 was then introduced and read for the first time in the Senate on April 24, amended on May 28, and passed as amended on May 28, 2001. A.B. 94 was returned to the Assembly, which did not concur with the Senate's amendments. The Senate did not recede from its amendments, so each chamber appointed the First Conference Committee on A.B. 94. On June 4, 2001, the Committee reported back to the Assembly with the recommendation to concur with the Senate's amendments of A.B. 94 and to further amend the bill. The Assembly adopted the First Conference Committee Report for A.B. 94, and the Report was sent to the Senate. The Senate adopted the Report at 12:38:59 a.m. PDST on June 5, 2001 (11:38:59 p.m. PST on June 4, 2001).

Thereafter, Brenda Erdoes of the Legislative Counsel Bureau declined to enroll A.B. 94 and did not deliver the bill to the Governor for his action.

On June 20, 2001, the Nevada Association of Counties and the Nevada Association of County Clerks and County Election Officials filed an original petition for a writ of mandamus (docketed as No. 38053) to compel Legislative Counsel to fulfill her constitutional and statutory duties to enroll A.B. 94 and deliver the bill to the Governor for his action.

## *PROPRIETY OF WRIT RELIEF*

A writ of mandamus is available to compel a public officer to perform an act that the law requires as a duty resulting from an

office, trust or station.[1] A writ of mandamus will not issue, however, to compel a public officer to perform an act that the officer has no legal duty or authority to perform.[2] A writ of mandamus also will not issue if the petitioner has a plain, speedy, and adequate remedy at law.[3] Petitions for extraordinary relief are addressed to the sound discretion of this court.[4]

Here, petitioners do not have a plain, speedy and adequate remedy at law. Moreover, these writ petitions raise an issue of first impression, one that needs clarification and is a matter of public importance: What, precisely, is the constitutional deadline for adjournment, before which a bill that has passed both houses must be enrolled and delivered to the Governor for action and after which any legislative action is void? We conclude that our consideration of these writ petitions is warranted.[5]

## *LEGISLATIVE PROCESS*

Under Nevada's Constitution, "a majority of all the members elected to each house is necessary to pass every bill or joint resolution," and "an affirmative vote of not fewer than two-thirds of the members elected to each house is necessary to pass a bill or joint resolution which creates, generates, or increases any public revenue in any form."[6] For a bicameral legislature such as Nevada's to pass a bill, both houses of the legislature must concur in and pass the same version of the bill during the same legislative session.[7] Thus, if each house passes a different version of a bill, both houses must subsequently concur in and pass the same

---

[1]NRS 34.160; *see Brewery Arts Ctr. v. State Bd. Examiners,* 108 Nev. 1050, 1053, 843 P.2d 369, 372 (1992).

[2]*Conklin ex rel. v. Buckingham,* 58 Nev. 450, 453-54, 83 P.2d 462, 463 (1938).

[3]NRS 34.170.

[4]*Smith v. District Court,* 107 Nev. 674, 818 P.2d 849 (1991).

[5]*Business Computer Rentals v. State Treas.,* 114 Nev. 63, 67, 953 P.2d 13, 15 (1998) (noting that when "an important issue of law needs clarification and public policy is served by this court's invocation of its original jurisdiction, . . . consideration of a petition for extraordinary relief may be justified").

[6]Nev. Const. art. 4, § 18(1) & (2).

[7]*McDougal v. Davis,* 143 S.W.2d 571, 571 (Ark. 1940) (observing, as an elementary proposition, that "[i]t is essential, of course, to the enactment of a bill into a law that both the House and the Senate shall concur in and pass the same bill"); *accord Lee v. City of Decatur,* 172 So. 284, 285 (Ala. 1937); *Watts v. Town of Homer,* 207 So. 2d 844, 846 (La. Ct. App. 1968); *Opinion of the Justices,* 83 A.2d 738, 741 (N.H. 1950).

version of the bill before they adjourn the legislative session.[8] If each house passes a different version of a bill and both houses do not subsequently concur in the same version, the bill has not passed the legislature, and no provision of the bill can become law.[9]

Under NRS 218.340, "[w]hen any bill or resolution is passed by both houses, the secretary of the senate or the chief clerk of the assembly shall immediately transmit the same to the legislative counsel to be enrolled." NRS 218.380 provides that "[a]n enrolled bill must be delivered by the legislative counsel, or such person as he designates in writing, to the governor for his action." In carrying out the statutory duties set forth in NRS 218.340 and NRS 218.380, Legislative Counsel is complying with the constitutional mandate that "[e]very bill which may have passed the Legislature, shall, before it becomes a law be presented to the Governor."[10] Consequently, if A.B. 94 and A.B. 661 were passed before the constitutional adjournment deadline, Legislative Counsel has a duty to enroll them and deliver them to the Governor. We conclude that the bills were passed, and that they therefore must be enrolled and delivered.

### DURATION OF THE REGULAR SESSION

The sessions of the Nevada Legislature are biennial and, under the Nevada Constitution, must commence on "the 1st Monday of February following the election of members of the Assembly, unless the Governor of the State shall, in the interim, convene the Legislature by proclamation."[11] The time for adjournment is constitutionally mandated under article 4, section 2, subsection 2, which provides:

> The Legislature shall adjourn sine die each regular session not later than midnight Pacific standard time 120 calendar days following its commencement. Any legislative action taken after midnight Pacific standard time on the 120th cal-

---

[8]*See Conway v. Searles,* 954 F. Supp. 756, 768 (D. Vt. 1997); *PA AFL-CIO ex rel. George v. Com.,* 757 A.2d 917, 921-23 (Pa. 2000); *League of Women Voters v. Com.,* 683 A.2d 685, 688 (Pa. Commw. Ct. 1996).

[9]*See McDougal,* 143 S.W.2d at 571; *Moore v. Neece,* 114 N.W. 767, 768-69 (Neb. 1908); *see also State ex rel. Grendell v. Davidson,* 716 N.E.2d 704, 709 (Ohio 1999) (noting that "Relators' contention that when the House and Senate pass different versions of a bill, the nondiffering provisions contained in the differing versions become law, is consequently meritless").

[10]Nev. Const. art. 4, § 35.

[11]Nev. Const. art. 4, § 2.

endar day is void, unless the legislative action is conducted during a special session convened by the Governor.

Although this provision seems plain on its face, petitioners and Legislative Counsel advocate different interpretations of two essential parts: "120 calendar days following its commencement" and "midnight Pacific standard time."[12] We must therefore decide whether the first day of the regular legislative session is included in the 120-day durational limit and whether midnight Pacific standard time is the same as midnight Pacific daylight saving time.

## CONSTITUTIONAL CONSTRUCTION

When construing constitutional provisions, we use the same rules of construction used to interpret statutes.[13] Our primary task, then, is to ascertain the intent of those who enacted the durational limit on legislative sessions, and to adopt an interpretation that best captures their objective.[14] We must give words their plain meaning unless doing so would violate the spirit of the provision.[15] We are concerned here with a narrow legal issue, not with the legislation itself; we express no opinion on the merits of A.B. 94 or A.B. 661.

## DISCUSSION

We first consider the meaning of the phrase "120 calendar days following its commencement." Petitioners urge us to apply the common law rule, which is reflected in Nevada's rules of court procedure,[16] that the day of the act or event from which the designated period begins to run should not be included. Under this interpretation, which would in effect create a 121-day durational limit, June 5, 2001, would have been the last day of the 71st regular legislative session.[17]

[12]We note that near midnight, the Legislature asked Legislative Counsel whether it could reasonably interpret midnight Pacific standard time to mean one hour later than midnight Pacific daylight saving time, so that it could work an additional hour. Legislative Counsel replied that it could, but cautioned the Legislature against doing so. In response to these petitions, Legislative Counsel argues that midnight Pacific standard time should be interpreted to mean the time on the clock.

[13]*Rogers v. Heller,* 117 Nev. 169, 176 n.17, 18 P.3d 1034, 1038 n.17 (2001).

[14]*McKay v. Bd. of Supervisors,* 102 Nev. 644, 648, 730 P.2d 438, 441 (1986); *State v. Glenn,* 18 Nev. 34, 42, 1 P. 186, 189 (1883).

[15]*McKay,* 102 Nev. at 648, 730 P.2d at 442.

[16]*See, e.g.,* NRAP 26(a); NRCP 6(a).

[17]*See Alaska Christian Bible Inst. v. State,* 772 P.2d 1079, 1080-81 (Alaska 1989) (applying the prevailing common law rule and concluding that Alaska's

Although the argument is a reasonable one and is consistent with common practice,[18] we reject it because the intent of the provision's framers and the voters who ratified it is clear. This constitutional amendment was proposed and passed by the 1995 Legislature, agreed to and passed by the 1997 Legislature, and approved and ratified by the citizens of Nevada at the 1998 general election. The ballot question submitted to the voters at the general election read (emphasis ours):

> Shall the Nevada Constitution be amended to limit the length of Nevada's regular legislative sessions *to not more than 120 calendar days* and require the Governor to submit the proposed executive budget to the Legislature at least 14 days before the start of each regular session?

The explanation that accompanied the ballot question also specified that the amendment "would limit future regular sessions to not more than 120 calendar days, starting in the 1999 session." This clear statement of intent dissolves any ambiguity inherent in the phrase "120 calendar days following its commencement." The day of commencement is included, and the adjournment deadline for the 71st regular legislative session was "midnight Pacific standard time" on the 120th calendar day: June 4, 2001.

But precisely when was "midnight Pacific standard time?" Nevada's change from Pacific standard time to Pacific daylight saving time on the first Sunday of April, midway through the regular session, created an ambiguity in the deadline. Is midnight Pacific standard time the same as midnight Pacific daylight saving time? We conclude that it is not and cannot be the same.

First, the terms "Pacific standard time" and "Pacific daylight saving time" are clear and distinct, with commonly understood meanings. Pacific daylight saving time denotes a time one hour later than Pacific standard time, and results from advancing the clock one hour every April, from 2:00 a.m. to 3:00 a.m. When the constitutional amendment was drafted, the Legislature obviously knew that the adjournment deadline would come sometime in early June after Nevada had changed over to Pacific daylight saving time. But instead of specifying that the regular session must end at "midnight Pacific daylight saving time," or just

---

120-day limit resulted in a 121-day session because the day the legislature convenes is not counted).

[18]*See, e.g., Nyberg v. Nevada Indus. Comm'n,* 100 Nev. 322, 323-25, 683 P.2d 3, 5 (1984); *Rogers v. State,* 85 Nev. 361, 364, 455 P.2d 172, 173-74 (1969); *Alaska Christian Bible Inst.,* 772 P.2d at 1081.

"midnight," the Legislature presented to the voters and the voters approved "midnight Pacific standard time" as the end of the session. We should give effect to this purposeful choice, rather than try to redefine "midnight Pacific standard time" as "midnight Pacific daylight saving time." In choosing this interpretation, the Legislature acted on Legislative Counsel's opinion that this is a reasonable construction of the provision. We agree that it is, and the Legislature is entitled to deference in its counseled selection of this interpretation.

Second, the historical development of these terms supports the conclusion that they are not interchangeable. During the 1880s, railroad companies divided the United States into four standard time zones to regulate train schedules and to avoid the uncertainties caused by the use of solar time.[19] In 1918, the United States Congress established "standard time" as the law of the nation.[20] The territory of the United States was divided into five zones, and a standard time for each zone was fixed based on the mean astronomical or solar time of a specified degree of longitude west from Greenwich.[21]

The Act of 1918 also established daylight saving time, but that provision was repealed in 1919. Daylight saving time was re-established by Congress during World War II, but after the war its use varied among state and local governments.[22] In 1966, Congress enacted the Uniform Time Act, which standardized the dates on which daylight saving time begins and ends, but allowed states to exempt all or portions of their territories from its observance.[23] Congress enacted earlier starting dates for daylight saving time in 1974 and 1975, "energy crisis" years, but amended the Act in 1986 so that daylight saving time always begins on the first Sunday in April and ends on the last Sunday in October.

A simple illustration demonstrates why midnight Pacific standard time is not the same as midnight Pacific daylight saving time. Nevada lies within the fifth time zone, which is designated and known as Pacific standard time.[24] Utah and Arizona, which border Nevada, lie within the fourth time zone, which is designated

[19]*McFarlane v. Whitney,* 134 S.W.2d 1047, 1051 (Tex. Comm'n App. 1940); *State v. Badolati,* 6 N.W.2d 220 (Wis. 1942).

[20]*McFarlane,* 134 S.W.2d at 1051; *see also* 15 U.S.C. §§ 260-67 (West 1997 & Supp. 2001).

[21]*McFarlane,* 134 S.W.2d at 1051.

[22]*See* Annotation, *Standard or System of Time,* 143 A.L.R. 1238 (1943).

[23]*See* 15 U.S.C. §§ 260-267.

[24]There are now nine standard time zones, from east to west: Atlantic standard time, eastern standard time, central standard time, mountain standard time, Pacific standard time, Alaska standard time, Hawaii-Aleutian standard time, Samoa standard time and Chamorro standard time. 15 U.S.C. § 263.

and known as mountain standard time. Arizona has exempted itself from daylight saving time,[25] but Nevada and Utah have not. Consequently, when Nevada and Utah advance their clocks on the first Sunday in April, and change from Pacific standard time to Pacific daylight saving time and from mountain standard time to mountain daylight saving time, respectively, Arizona remains on mountain standard time. Arizona does not change times, but its clocks become synchronized with Nevada's clocks instead of Utah's. Since Nevada's Pacific daylight saving time is the same as Arizona's mountain standard time, it is not and cannot be the same as Pacific standard time as well.

Similarly, had Nevada exempted itself from daylight saving time, or should it choose to do so in the future, Nevada would remain on standard time when its fifth time zone neighbors change to daylight saving time. After the change, Nevada and California would both still be on Pacific time, but Nevada would be on Pacific standard time and California would be on Pacific daylight saving time. As a result, their clocks would not strike midnight simultaneously; at midnight in Nevada it would be 1:00 a.m. in California. Clearly, Pacific standard time is not the same as Pacific daylight saving time.

The standard time zones do not change, and standard time also does not change. Although daylight saving time may become the "standard" for nearly seven months out of the year for those states in the Pacific zone that choose to use it, it does not become "Pacific standard time." That term is precise and specific. Pacific standard time is, by design and definition,[26] one hour earlier than Pacific daylight saving time. We are not free to presume that the framers of the durational limit and those who enacted it meant anything other than exactly what they said.[27]

Third, article 4, section 2, subsection 2 gives the Legislature 120 days for its regular session. A day consists of 24 hours, so the Legislature has 2,880 hours before it must adjourn under the constitutional deadline. When Nevada advanced its clocks on the first Sunday in April, that day was shortened to 23 hours. Although the Legislature may choose not to use every hour allotted to it—it does not, for instance, convene at 12:01 a.m.

[25]The Navajo Indian Reservation in Arizona has not exempted itself; the Navajo Nation, which extends into Arizona, Utah and New Mexico, observes daylight saving time.

[26]*Webster's Tenth Collegiate Dictionary* 294 (10th ed. 1997) ("daylight saving time" defined as "time [usually] one hour ahead of standard time").

[27]*See Galloway v. Truesdell,* 83 Nev. 13, 26, 422 P.2d 237, 246 (1967) (noting that when the Legislature chooses one option and not another, it is presumed that the Legislature did so purposely).

although it could—its last available hour expired not at midnight Pacific daylight saving time on June 4, 2001, but instead one hour later.[28]

## CONCLUSION

The fundamental intent of the constitutional amendment is to set a durational limit on legislative sessions. Our construction of the provision gives full effect to the 120-day limitation, without extending the limitation beyond its terms or frustrating its purpose. It would be absurd for us to interpret Pacific standard time to be the same as Pacific daylight saving time, and we decline to do so.[29] Midnight Pacific standard time on June 4, 2001, was the equivalent of 1:00 a.m. Pacific daylight saving time on June 5, 2001, and the Legislature had authority to act until the clock struck 1:00 a.m. Since A.B. 94 and A.B. 661 were passed by both houses before the adjournment deadline, Legislative Counsel has a constitutional and statutory duty to enroll the bills and deliver them to the Governor.

Accordingly, we grant these petitions. The clerk of this court shall issue writs of mandamus compelling Legislative Counsel to enroll Assembly Bills No. 94 and No. 661, and deliver them to the Governor for action.

YOUNG, ROSE and BECKER, JJ., concur.

AGOSTI, J., concurring:

I concur in the result reached by the majority. I believe that the words "Pacific standard time" must be given their common and ordinary meaning. When that is done, it is clear that the Legislature lawfully proceeded to consider and pass laws until 1:00 a.m. Pacific daylight saving time.

I write separately because I disagree with the majority's conclusion that the words "120 calendar days following its commencement" are ambiguous. I believe that the phrase is clear and unambiguous, and therefore that resort to rules of construction is improper.[1] Another way of saying that the Legislature shall

---

[28]*See Ellard v. Goodall,* 83 So. 568, 569 (Ala. 1919) (holding that a bill of exceptions presented 45 minutes before the expiration of the 90th day if measured by central standard time, but 15 minutes late if measured by daylight saving time, was timely because a state statute allowed 90 days of 24 hours each within which to present a bill of exceptions).

[29]*See Rogers,* 117 Nev. at 176 n.17, 18 P.3d at 1038 n.17; *General Motors v. Jackson,* 111 Nev. 1026, 1029, 900 P.2d 345, 348 (1995) (noting that statutory interpretation should avoid absurd or unreasonable results).

[1]*See, e.g., County of Clark v. Doumani,* 114 Nev. 46, 52, 952 P.2d 13, 16 (1998) (holding that when a statute's language is plain and unambiguous,

adjourn the regular session "120 calendar days following its commencement" is to say that the Legislature must adjourn the session 120 days after it starts. That does not mean that the Legislature can meet for 121 days. Such a conclusion is as unreasonable as concluding that a five-day workweek means six actual days of work, or that a three-month summer vacation from school really means four months off.

MAUPIN, C. J., dissenting:

Article 4, section 2, subsection 2 of the Nevada State Constitution provides:

> The Legislature shall adjourn sine die each regular session not later than midnight Pacific standard time 120 calendar days following its commencement. Any legislative action taken after midnight Pacific standard time on the 120th calendar day is void, unless the legislative action is conducted during a special session convened by the Governor.

This court has been asked to determine whether legislative approval of two measures between 12:00 a.m., Pacific daylight saving time, June 4, 2001, and 1:00 a.m., Pacific daylight saving time, June 5, 2001, are in compliance with the above-quoted provision.

This court has determined that these writ petitions present two primary issues of interpretation: (1) whether 120 days "following commencement" includes the first day of the session; and (2) whether 1:00 a.m. Pacific daylight saving time equates to "midnight Pacific standard time."

*120 days*

I agree with all six of my colleagues that the people of this state intended the State Legislature to deliberate over its legislative responsibilities during a period totaling, or limited to, 120 calendar days. This conclusion is based upon the following language in a ballot question, which appeared on the 1998 general election ballot:

> Shall the Nevada Constitution be amended to limit the length of Nevada's regular legislative sessions to not more than 120 calendar days . . . ?

The contrary construction urged by petitioners, made by analogy to our rules for calculating legal deadlines, is not of neces-

---

there is no room for construction and courts are not permitted to search for its meaning beyond the statute itself); *see also Rogers v. Heller,* 117 Nev. 169, 176 n.17, 18 P.3d 1034, 1038 n.17 (2001) (holding that the rules governing statutory construction also govern the construction of constitutional provisions).

sity unreasonable. However, our interpretation resolving this first threshold issue is more in line with the intent of the voters.

*Midnight*

The second issue presents a more interesting and unique problem. The term "midnight," in and of itself, is not ambiguous. Going further, the language of the constitutional amendment establishing an adjournment deadline of "midnight Pacific standard time" seems perfectly plain and unambiguous in writing. This language is, however, tantalizingly ambiguous in application because Nevada changes from Pacific standard time to Pacific daylight saving time during the regular legislative session. Thus, the constitutional provision cannot be applied as written. As I will explain below, the deadline urged by petitioners, "midnight Pacific standard time," if it is the functional equivalent of 1:00 a.m. Pacific daylight saving time, did not occur on the 120th day of the session.

The majority, correctly in my view, indicates that the term "standard time," in its ordinary meaning, is different than "daylight saving time." I would therefore have to agree that, standing alone, adjournment at midnight Pacific standard time meant 1:00 a.m. daylight saving time. Having said this, the language pertaining to midnight adjournment must be read in conjunction with the requirement that the session must not exceed 120 calendar days. When this exercise in construction is accomplished, the majority's conclusion arguably becomes problematic.

First, under the 120-day limitation, the final day of the legislative session was set for Monday, June 4, 2001. Second, although "midnight Pacific standard time," again standing alone, may equate to 1:00 a.m. daylight saving time, the one-hour time frame between 12:00 a.m. and 1:00 a.m. Pacific daylight saving time legally elapsed on Tuesday, June 5, 2001. In other words, the measures that are the subject of these writ petitions were, as a matter of law, finally approved by both houses of the Legislature on Tuesday, June 5, not Monday, June 4. Thus, regardless of how we interpret the meaning of the term "midnight Pacific standard time," the legislative measures that are the subject of this controversy were actually approved on the one hundred and twenty-first "calendar" day of the legislative session.

To conclude, the pertinent language of article 4 of the Nevada Constitution requires that the Legislature adjourn any regular biennial session "not later than midnight Pacific standard time 120 calendar days following its commencement." As noted, the ambiguity created by the change from standard to daylight saving time during regular legislative sessions renders this provision internally inconsistent. It is evident to me that, if midnight

"Pacific standard time" means anything other than midnight "Pacific daylight saving time," the midnight adjournment does not and cannot occur on the 120th "calendar" day of the session. Thus, at least in my view, that internal inconsistency cannot be resolved unless midnight standard time is construed in accordance with JUSTICE LEAVITT's discussion in his separate dissent.

In light of the above, I would deny these petitions.

### Concluding remarks

I would additionally note that resolving this matter was not as simple as one might conclude from a superficial recapitulation of the issues presented. We have been charged with deciding whether midnight means 1:00 a.m., Pacific standard time, or whether standard time means daylight saving time. Neither, of course, is literally true. Although it appears that we have been engaged, as some have said, in an intellectual exercise akin to "angels dancing on the head of a pin," such is not the case. This is simply the inevitable result of a process that requires this court to resolve a very troubling, albeit technical, internal inconsistency in the constitutional provision at issue here. That I happen to disagree with our majority does not undermine the thoughtfulness with which this court as a whole has resolved this historic dispute.

LEAVITT, J., dissenting:

I respectfully dissent because I disagree with the majority that midnight is 1:00 a.m. The majority agrees with petitioners that Nevada Constitution article 4, section 2's use of "Pacific standard time" is meant to differentiate from "daylight saving time," as the measure of when the Legislature must adjourn. Thus, under their conclusion, midnight is not really midnight; instead, midnight is 1:00 a.m. I am not convinced that logic and reason lead to midnight being 1:00 a.m.

The dictionary defines the term "standard time" as "the time of a region or country that is established by law or general usage as civil time."[1] This definition is consistent with the conclusion: standard time is the time reflected on the clock, the time generally used in a particular area. A reading of the pertinent federal statute leads to this same conclusion.

Under section 260a of the Uniform Time Act of 1966, commencing the first Sunday of April and ending the last Sunday of October each year, the standard time of each zone is advanced one hour. This advanced time *becomes* the standard time:

> During the period commencing at 2 o'clock antemeridian on the first Sunday of April of each year and ending at 2 o'clock

---

[1] *Webster's Tenth Collegiate Dictionary* 1146 (1997 ed.).

antemeridian on the last Sunday of October of each year, the standard time of each zone established by sections 261 to 264 of this title, as modified by section 265 of this title, shall be advanced one hour and *such time as so advanced shall for purposes of such sections 261 to 264, as so modified, be the standard time of such zone during such period.*[2]

Thus, within a particular zone, the advanced, "daylight saving time" becomes the standard time for that zone during the designated period from April to October.[3] Under the provisions of section 260a, a state may by law exempt itself from the application of advanced time.[4] Nevada, however, has not done so. In the absence of Nevada law establishing a standard of time for this state, the federal statute dictates the observance of federal standard time.[5]

The majority states that the term "Pacific standard time" is precise and specific. Moreover, the majority insists that they are not free to presume any other meaning than that given by the framers, and yet, that is precisely what the majority has done, by presuming that midnight is 1:00 a.m.

The entire phrase, "midnight Pacific standard time," read together results in only one conclusion: midnight Pacific standard time is midnight on the Legislature's clock in Carson City, Nevada. This state falls into the Pacific time zone and all of our citizens, as well as our state government, conduct their business and social affairs in accordance with the time on the clock. To conclude that the Legislature is free to follow a different clock than all of the people of this state is an absurd and unreasonable result.

The legislative history reveals that the Legislature previously had a tradition of literally covering the clock on the last day of the regular session to allow extra time in which to complete its business. Article 4, section 2 prevents the Legislature from "covering the clock" and continuing until "midnight" in some time zone west of Nevada. The phrase "Pacific standard time" is intended

[2]15 U.S.C. § 260a (1994) (emphasis added).

[3]*Cf. Miracle Auto Ctr. v. Superior Court,* 80 Cal. Rptr. 2d 587, 588-89 (1998) (construing analogous state statutes and concluding that "standard time" means the time then in effect, whether it is "Standard Pacific Time" or "Daylight Saving Time").

[4]15 U.S.C. § 260a(a) (providing that a state by law may exempt itself from observing advanced time applicable during the designated period from April through October).

[5]*See, e.g., State Election Board v. McClure,* 189 N.E.2d 711, 714 (Ind. 1963); *State v. Frye,* 157 N.W.2d 830, 831-32 (N.D. 1968); *see generally McFarlane v. Whitney,* 134 S.W.2d 1047, 1051 (Tex. Comm'n App. 1940); *Anderson v. Cook,* 130 P.2d 278, 281-82 (Utah 1942).

to specify the time in Carson City, not Hawaii-Aleutian standard time or Samoa standard time.

Further, in these petitions, the Legislature itself, which drafted this provision, has taken the position that midnight is midnight. The Legislature is entitled to deference in its interpretation of the provision's terms.[6] As an additional indication of the Legislature's position, in 1999, after the 120-day limit was passed, the Nevada Legislature adopted a Joint Standing Rule 14.3 of the Senate and Assembly that set deadlines for bills and final actions on bills by standing committees in both houses. Those deadlines were used to create a deadline calendar for the 120-day session. The deadline calendar numbered the day of commencement as day one for the 120-day period. The Legislature finally adjourned by *midnight* on the 120th day.[7]

The legislative history leaves no doubt that article 4, section 2 is intended to limit regular legislative sessions to 120 total days and to give the Legislature a clear time, *midnight* Pacific standard time, to end business for the session. To suggest, as the majority does, that the Legislature may create additional time for itself, should the need arise, is contrary to the Legislature's intent to limit the time in which it must conduct business to a total of 120 days.

In my view, "midnight Pacific standard time" means midnight by the clock. This interpretation is the only reasonable one: otherwise, midnight is not midnight, and the Legislature is on a clock that ticks differently than every other in Nevada.

For these reasons, I dissent.

---

[6]*See* NRS 218.240(1) (establishing procedures for assistance of legislative counsel bureau in preparation of legislative measures); *cf. State ex rel. Tax Comm'n v. Saveway,* 99 Nev. 626, 630, 668 P.2d 291, 294 (1983) (stating that "[g]reat deference will be afforded to an administrative body's interpretation when it is within the statutory language; moreover, the Legislature's acquiescence in an agency's reasonable interpretation indicates that the interpretation is consistent with legislative intent").

[7]*State v. Howell,* 26 Nev. 93, 104, 64 P. 466, 468 (1901) (noting that, while not binding upon this court, a contemporaneous construction placed upon a constitutional provision by the Legislature "should be given great weight").