HONORABLE KENNY GUINN, GOVERNOR OF THE STATE OF NEVADA, PETITIONER, *v.* THE LEGISLATURE OF THE STATE OF NEVADA; HONORABLE LORRAINE T. HUNT, PRESIDENT OF THE SENATE; HONORABLE RICHARD D. PERKINS, SPEAKER OF THE ASSEMBLY; MARK E. AMODEI, SENATOR; TERRY CARE, SENATOR; MAGGIE CARLTON, SENATOR; BARBARA CEGAVSKE, SENATOR; BOB COFFIN, SENATOR; WARREN B. HARDY, SENATOR; BERNICE MATHEWS, SENATOR; MIKE McGINNESS, SENATOR; JOSEPH M. NEAL, JR., SENATOR; DENNIS NOLAN, SENATOR; ANN O'CONNELL, SENATOR; WILLIAM J. RAGGIO, SENATOR; RAYMOND D. RAWSON, SENATOR; DEAN A. RHOADS, SENATOR; MICHAEL SCHNEIDER, SENATOR; RAYMOND C. SHAFFER, SENATOR; SANDRA TIFFANY, SENATOR; DINA TITUS, SENATOR; RANDOLPH TOWNSEND, SENATOR; MAURICE WASHINGTON, SENATOR; VALERIE WIENER, SENATOR; BERNIE ANDERSON, ASSEMBLYMAN; WALTER AN-DONOV, ASSEMBLYMAN; SHARRON E. ANGLE, ASSEMBLYWOMAN; MORSE ARBERRY, JR., ASSEMBLYMAN; KELVIN D. ATKINSON, ASSEMBLYMAN; BOB BEERS, ASSEMBLYMAN; DAVID BROWN, ASSEMBLYMAN; BARBARA E. BUCKLEY, ASSEMBLYWOMAN; JOHN C. CARPENTER, ASSEMBLYMAN; VONNE S. CHOWNING, ASSEMBLYWOMAN; CHAD CHRISTENSEN, ASSEMBLYMAN; JERRY D. CLABORN, ASSEMBLYMAN; TOM COLLINS, ASSEMBLY-MAN; MARCUS CONKLIN, ASSEMBLYMAN; JASON GED-DES, ASSEMBLYMAN; DAWN GIBBONS, ASSEMBLYWOMAN; CHRIS GIUNCHIGLIANI, ASSEMBLYWOMAN; PETE GOICOECHEA, ASSEMBLYMAN; DAVID GOLDWATER, ASSEMBLYMAN; TOM GRADY, ASSEMBLYMAN; JOSH GRIF-FIN, ASSEMBLYMAN; DON GUSTAVSON, ASSEMBLYMAN; JOE HARDY, ASSEMBLYMAN; LYNN C. HETTRICK, ASSEMBLYMAN; WILLIAM C. HORNE, ASSEMBLYMAN; RON KNECHT, ASSEMBLYMAN; ELLEN M. KOIVISTO, ASSEMBLYWOMAN; SHEILA LESLIE, ASSEMBLYWOMAN; R. GARN MABEY, JR., ASSEMBLYMAN; MARK A. MA-NENDO, ASSEMBLYMAN; JOHN A. MARVEL, ASSEMBLY-MAN; KATHY McCLAIN, ASSEMBLYWOMAN; BOB McCLEARY, ASSEMBLYMAN; HARRY MORTENSON, ASSEMBLYMAN; JOHN OCEGUERA, ASSEMBLYMAN; GENIE OHRENSCHALL, ASSEMBLYWOMAN; DAVID R. PARKS, ASSEMBLYMAN; PEGGY PIERCE, ASSEMBLYWOMAN; ROD SHERER, ASSEMBLYMAN; VALERIE WEBER, ASSEMBLY-WOMAN; AND WENDELL P. WILLIAMS, ASSEMBLYMAN, RESPONDENTS.

LYNN HETTRICK; GARN MABEY; BOB BEERS; VALERIE WEBER; CHAD CHRISTENSEN; WALTER ANDONOV; DAVID BROWN; SHARRON ANGLE; DON GUSTAVSON; JOHN MARVEL; JOHN CARPENTER; PETE GOICOECHEA; ROD SHERER; TOM GRADY; RON KNECHT; BARBARA CEGAVSKE; MIKE McGINNESS; ANN O'CONNELL; SANDRA TIFFANY, AND MAURICE WASHINGTON, MEMBERS OF THE LEGISLATURE OF NEVADA, COUNTER-PETITIONERS, v. HONORABLE KENNY GUINN, GOVERNOR OF THE STATE OF NEVADA, AND THE LEGISLA-TURE OF THE STATE OF NEVADA, COUNTER-RESPONDENTS.

No. 41679

September 17, 2003                                    76 P.3d 22

*Brian Sandoval,* Attorney General, and *Jeff E. Parker,* Solicitor General, Carson City, for Petitioner and Counter-Respondent.

*Brenda J. Erdoes,* Legislative Counsel, Carson City; *Hale Lane Peek Dennison & Howard* and *N. Patrick Flanagan III,* Reno, for Respondent Nevada State Legislature.

*Allison, MacKenzie, Russell, Pavlakis, Wright & Fagan, Ltd.,* and *Mark E. Amodei,* Carson City, for Respondents Terry Care and Mark E. Amodei.

*Kathleen J. England,* Las Vegas, for Respondent Morse Arberry, Jr.

*Barbara E. Buckley,* Carson City, in Proper Person.

*Beckley Singleton, Chtd.,* and *Daniel F. Polsenberg* and *Beau Sterling,* Las Vegas, for Counter-Petitioners.

*Jeffrey S. Blanck,* General Counsel, Washoe County School District, Reno; *Walther Key Maupin Oats Cox & LeGoy* and

*Michael E. Malloy,* Reno, for Amicus Curiae Washoe County School District.

*Dyer, Lawrence, Penrose, Flaherty & Donaldson* and *Michael W. Dyer,* Carson City, for Amici Curiae Nevada State Education Association, Clark County Education Association, Education Support Employees Association of Clark County, and Washoe Education Association.

*Ellsworth Moody & Bennion, Chtd.,* and *Keen L. Ellsworth,* Las Vegas, for Amicus Curiae Nevada Congress of Parents and Teachers Association.

*C. W. Hoffman Jr.,* General Counsel, Las Vegas, for Amicus Curiae Clark County School District.

*Law Offices of Thomas D. Beatty* and *Thomas D. Beatty,* Las Vegas, for Amici Curiae Clark County Association of School Administrators, Washoe County Education Administrators, and Nevada Association of School Administrators.

*McCracken Stemerman Bowen & Holsberry* and *Richard G. McCracken,* Las Vegas, for Amici Curiae Nevada State AFL-CIO and Nevada State Employees Association, AFSCME, Local 4041.

*McDonald Carano Wilson LLP* and *John J. Laxague, Michael A. T. Pagni, Jeffrey A. Silvestri* and *Thomas R. C. Wilson II,* Reno, for Amici Curiae Nevada Taxpayers Association, Associated Builders and Contractors—Sierra Nevada Chapter, AGC Nevada, Nevada Association of Mechanical Contractors, Sierra Chemical Company, Polymer Plastics Corporation, Barth Electronics, EDAWN/Western Nevada Development Authority, Nevada Consumer Finance Corporation, Nevada Petroleum Marketers and Convenience Store Association, Cal-Neva Franchise Owners Association, 7-Eleven Franchise Owners Association of Southern Nevada, Nevada Resident Agents Association, Monte L. Miller and Joshua C. Miller, Nevada Bankers Association, Nevada Manufacturers Association, Nevada Motor Transport Association, Retail Association of Nevada, Tiberti Fence Company, Carson City Chamber of Commerce, Las Vegas Chamber of Commerce, Nevada Franchised Auto Dealers Association, Nevadans for Real Tax Fairness, Household International, Nevada Corporate Headquarters—Cort Christie, Robert List, Henderson Chamber of Commerce, Thomas Powell, Pic-Mount Imaging Corp., Phoenix Holdings of Nevada, Inc., Nevada Association of Independent Businesses, Chain Drug Council of Nevada, and Grocery Industry Council of Nevada.

*Thomas J. Ray,* General Counsel, Las Vegas, for Amicus Curiae University and Community College System of Nevada.

*James T. Richardson,* Reno, for Amicus Curiae Nevada Faculty Alliance.

*Layne T. Rushforth,* Las Vegas, for Amicus Curiae Nevada Concerned Citizens.

*Wilson & Barrows* and *Stewart R. Wilson,* Elko; *Gregory T. Broderick,* Sacramento, California, for Amicus Curiae Pacific Legal Foundation.

Before the Court En Banc.

## OPINION

*Per Curiam:*

On July 10, 2003, we entered an opinion in this matter partially granting the Governor's petition for a writ of mandamus and denying the counter-petition filed by twenty Legislators. Our opinion directed this court's clerk to issue a writ directing the Legislature "to proceed expeditiously with the 20th Special Session under simple majority rule." The impetus for the writ petition, and our opinion, was the Nevada Legislature's continued failure to appropriate funds for the K-12 school system and to balance the state's budget by providing an adequate revenue plan to defray the state's estimated expenses for the biennium beginning July 1, 2003.

On July 21, 2003, the counter-petitioners filed a rehearing petition, asking us to recall our writ of mandamus, reconsider our opinion, and grant one of the remedies suggested in the counter-petition. Later that same day, the Legislature fulfilled its constitutional duties to fund the public school system and balance the budget, and it adopted the revenue-raising legislation required to balance the budget by a two-thirds supermajority. According to the Legislature,

> The Court's ruling in this case facilitated a shift from the tension that was caused by an externally-imposed requirement to achieve a 2/3 consensus, to a situation where the legislators were internally motivated to achieve a 2/3 consensus voluntarily. This shift in perception allowed reevaluation of fixed positions which led expeditiously to the passage of Senate Bill No. 8 . . . .

The counter-petitioners then supplemented their rehearing petition and moved this court to withdraw its opinion. At our direction, the Governor and Legislature responded to the rehearing petition. Assemblyman Arberry filed a supplemental response. Amici Curiae Education Associations[1] and the Pacific Legal Foundation also filed responses. Counter-petitioners filed a reply.

---

[1]Nevada State Education Association, Clark County Education Association, Education Support Employees Association of Clark County and Washoe Education Association.

The Legislative stalemate that was thrust upon us was the result of a recent Nevada constitutional amendment requiring a two-thirds majority to pass legislation that creates, generates or increases any public revenue, including taxes. The Senate had passed legislation that would have completed the budget process, but the Assembly had deadlocked and could not garner the necessary two-thirds vote because of a difference of opinion among Assembly members over the role the two-thirds provision played in the budget process. The deadlock prevented the Assembly from funding the K-12 appropriations bill and balancing the budget.

We concluded, based on the calamitous circumstances facing our state, that the Legislature could proceed with the 20th Special Session under a simple majority requirement, given that the dispute over the two-thirds majority requirement's applicability to the budget process had prevented the Legislature during one regular and two special sessions from fulfilling its constitutional duties to appropriate funds and to maintain the public school system while balancing the budget. Accordingly, we granted the petition as to the Legislature as a body, but denied the petition as to the individual legislators and the Lieutenant Governor. We also denied the counter-petition, which requested us to determine that the two-thirds supermajority provision applied not only to increases in revenue, but to the budget itself.

## BACKGROUND

The Nevada Constitution has, since it was enacted, required that bills and joint resolutions be passed by a simple majority of each house. Article 4, Section 18(1) originally provided that ''a majority of all the members elected to each house is necessary to pass every bill or joint resolution.''[2] In 1993, a member of the Legislature sponsored a resolution that proposed amending the Constitution to require a two-thirds majority of each house to increase certain existing taxes or impose new taxes.

At a hearing on the proposed resolution, legislators asked one of the main proponents if the other states with similar provisions required a supermajority to approve the state budget as well as new taxes, or if these states retained a simple majority for budget approval and a supermajority for funding.[3] Legislative members pointed out to the proponent that the proposed amendment did not address the budget, only changes in revenue. Thus the Constitution,

---

[2]*Debates & Proceedings of the Nevada State Constitutional Convention of 1864,* at 837 (Andrew J. Marsh off. rep., 1866) [hereinafter *Debates & Proceedings*].

[3]Hearing on A.J.R. 21 Before the Assembly Comm. on Taxation, 67th Leg. (Nev., May 4, 1993) (discussions involving Assembly members James A. Gibbons, Larry L. Spitler and Myrna T. Williams).

if amended, would require a two-thirds majority to change the existing revenue structure, but only a simple majority to approve the budget.[4]

The members noted that once the budget is approved, the Nevada Constitution requires that revenue be increased to balance the budget where the cost of services exceeds projected revenue.[5] Finally, the legislators expressed their concerns that the proposed language would create the potential for a constitutional crisis because a minority of legislators might disagree with the majority's lawfully approved budget and therefore refuse to consider any revenue increases until their budgetary concerns were met, thus creating a deadlock. The amendment, according to one legislator, "was actually empowering a smaller group of people not to fund the budget."[6] The legislators were concerned that the process would allow a minority of the Legislature, representing a minority of this State's citizens, to control public services, contrary to the wishes of a majority of the Legislature, representing a majority of the citizens.[7]

The proponent did not answer the questions posed by other legislators, but indicated that the issues would be researched and additional information would be provided to committee members.[8] The record does not reflect whether additional information was provided, and the Legislature declined to approve the proposal.[9] The proponents then took the proposal directly to Nevada's voters through the initiative process.

Unfortunately, the initiative petition and proposed amendment did not resolve the conflict discussed in the legislative hearings. Although the initiative's proponents were aware of the potential conflict that could result from requiring a simple majority for appropriations and a supermajority for new or increased public revenue, they did not specifically address this problem in the initia-

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] In answer to the question concerning minority control, at least one state, Florida, has adopted some flexibility in its supermajority tax provision. Florida does not include money necessary to support state bonds in the supermajority requirement and permits increases when necessary to offset changes in federal laws, such as Medicare, that impact the state. Fla. Const. art. VII, § 1(e). Oregon, with a legislature that also meets biennially, allows its equivalent of Nevada's Interim Finance Committee to approve new programs and revenue to support those programs when the legislature is not in session, subject to retroactive approval at the next session. Or. Const. art. III, § 3.

tive's language. Nor did the arguments for and against passage, presented in the voter information and sample ballot pamphlet, discuss the issue or the effect the proposal could have on other constitutional rights or the state's overall fiscal integrity.[10] Nevada's voters passed the constitutional amendment in the 1994 and 1996 general elections.[11] Consequently, Nevada's Constitution, in Article 4, Section 18(2), now requires a two-thirds vote of each house "to pass a bill or joint resolution which creates, generates, or increases any public revenue in any form, including but not limited to taxes, fees, assessments and rates, or changes in the computation bases for taxes, fees, assessments and rates." But the initiative did nothing to the constitutional mechanism for passing the underlying appropriations bills,[12] which requires only a simple majority vote under Article 4, Section 18(1). Thus, the stage was set for legislative impasse.

As noted in our prior opinion, the Nevada Legislature, which currently meets only every other year for an abbreviated 120-day regular session,[13] adequately functioned within the new constraints in the 1997, 1999 and 2001 sessions. Then, the state had a budget surplus and the budget could be balanced without major tax increases. By 2003, however, the state's economic situation had changed drastically.

The impact of terrorism, economic recession and increases in population caused the Governor to begin the 2003 legislative session with a $980 million request for new revenue to balance his proposed budget for the 2003-2005 biennium. The revenue request was based on the need to cover revenue shortfalls caused by the downward trend in Nevada's economy after the terrorist attacks of September 11, 2001, and increased expenses relating to terrorism, growth and changes mandated by federal laws. Over the four-month regular session, the proposed budget was reduced by ap-

---

[10]*Compare* Compilation of Ballot Questions 1996, Question No. 11, Arguments for Passage (stating that "[i]t may be more difficult for special interest groups to get increases they favor," and that it may require state government to prioritize and economize), *with id.* Arguments Against Passage (stating that "Nevada must remain flexible to change the tax base").

[11]*See* Nev. Const. art. 19, § 2(4) (providing that a constitutional amendment requires approval of a majority of the voters at two general elections).

[12]Nevada's budget is composed of several separate bills: the General Appropriations Act (funds most state government); the Authorized Expenditure Act; the bill appropriating funds to the State Distributive School Account (funding K-12 education); the Class-Size Reduction Act; the Capital Improvement Bill (authorizing construction, maintenance and repair of state buildings); and the Unclassified Pay Bill.

[13]Nev. Const. art. 4, §§ 2(1), 2(2). The 1997 session was not subject to the 120-day limitation, as the limit was not approved by the voters until 1998.

proximately $135 million. However, philosophical differences still permeated the final days of the regular legislative session. Consequently, by the June 3 conclusion of the 2003 regular session, the Legislature did not complete its constitutional duty to approve a balanced budget, but it appropriated $3,264,269,361 for various government functions and the Governor signed these appropriations into law.[14]

The Legislature further failed in its constitutional duty to appropriate funds for Nevada's public school system.[15] This funding dilemma apparently resulted from a confluence of factors, including the abbreviated nature of the regular legislative session; the need to address the comprehensive mandates of the new Federal No Child Left Behind Act;[16] and policy disagreements between the Senate and Assembly in regard to consolidating certain childhood educational programs, implementing class-size reduction programs, earmarking money for textbooks and other instructional materials, and encouraging experienced teachers to work in at-risk schools or schools designated as needing improvement and, of course, the revenue shortfalls.

On June 3, 2003, the Governor convened the 19th Special Session of the Legislature to appropriate funds for public education and to provide a tax plan sufficient to pay for the state's services and balance the final budget.[17] On June 6, 2003, the Senate passed Senate Bill 2 to authorize and appropriate the State Distributive School Account (SDSA) in the general fund for the fiscal years beginning July 1, 2003, and July 1, 2004. But Senate Bill 2 lacked the votes necessary to pass the Assembly, because the passage of the bill, without a revenue plan, would violate the balanced budget provisions of the Constitution. Certain Assembly members insisted that the two-thirds requirement applied to the budget as well as the tax structure. These individuals argued that the Governor should expand the special session to include all components of the budget and that the budget process be reopened so cuts in services as well as tax increases could be considered in reaching a balanced budget.

Because the majority of the Legislature did not agree with this interpretation and the request to reopen the budget process, no progress on finalizing and balancing the budget was made and public schools remained unfunded. Consequently, on June 12, 2003,

---

[14]All but three sections of this law took effect on July 1, 2003. Two provisions took effect on June 3, 2003, and one other will take effect on July 1, 2004. 2003 Nev. Stat., chs. 327, 328 and 441.

[15]Nev. Const. art. 11, § 6. Because the State Distributive School Account is such a large component of the general fund, difficulties concerning the supermajority provision's application were certain to arise with respect to public school funding, no matter when addressed.

[16]20 U.S.C. §§ 6301-7014.

[17]Nev. Const. art. 5, § 9; *id.* art. 4, § 2(2).

the Governor adjourned the 19th Special Session as requested by the Senate Majority Leader and the Speaker of the Assembly.

With no end to the stalemate in sight, the Governor convened the Legislature that same day for a second special session (the 20th Special Session) to begin on June 25, 2003.[18] On the first day of that session, the Senate unanimously passed Senate Bill 5 to authorize and appropriate the SDSA, and transmitted the legislation to the Assembly. In addition, the Senate, by the constitutionally mandated two-thirds majority, passed tax measures that provided a balanced budget for the 2003-2005 biennium, Senate Bills 2 and 6. Once again, Senate Bill 2 was not passed out of the Assembly. Assembly members sought, however, to amend Senate Bill 6 to incorporate the SDSA authorization and appropriations and provide sufficient taxes to balance the budget. But faced with renewed demands that the budget be reopened for cuts in spending, the Assembly twice failed to pass the amended bill by the required two-thirds majority; both votes were 27 to 15, one vote shy of the constitutionally mandated supermajority.

The Governor, who is responsible for ensuring that Nevada's laws are faithfully executed[19] and for submitting a proposed state budget to the Legislature,[20] filed a petition for a writ of mandamus at the start of the fiscal year, July 1, 2003, seeking to compel the Legislature to fulfill its constitutional duties by funding K-12 public education and passing a balanced budget. The Legislature, in its official response to the petition, asserted that a writ should not issue because no dispute existed over the interpretation of the Constitution and the Legislature simply needed more time to come to a consensus. The Legislature indicated, through counsel, that the plain language of the Constitution required a simple majority to pass the budget, while the supermajority provisions only applied to a specific proposal to increase, change or create taxes, not the total amount of revenue to be generated.

The Legislature reached this conclusion using standard rules of constitutional construction. In its answer, the Legislature indicated that its construction was the only way to harmonize the simple majority provision for the budget with the supermajority provision for taxes and the constitutional requirement that revenues shall be raised to balance a budget. According to the Legislature, when a legislative majority approves a budget, it does so with full knowledge of the revenue projections and the Constitution's mandatory balanced budget provisions. As the Legislature noted, when an approved budget exceeds the projected revenues, the Constitution re-

---

[18] At this point, the special sessions were reportedly costing the taxpayers $50,000 per day.

[19] Nev. Const. art. 5, § 7.

[20] *Id.* art. 4, § 2(3).

quires that revenues be raised to balance the budget. By approving the budget, the majority has already decided that the expenditures for services embodied in the budget are necessary and that revenue must be increased to provide for them. Thus, the majority decides whether additional revenue is necessary and the total amount of revenue that needs to be raised to balance the budget. The manner in which revenues will be raised, that is, the specific changes in the tax structure, then requires supermajority approval.

However, a minority of legislators disagreed with the official response. They filed a separate answer and counter-petition. The counter-petition sought to compel the Governor to call a special session to consider and make cuts to the entire state budget and requested this court to hold the supermajority provision applies to the budget process whenever a budget requires revenue increases. The counter-petitioners acknowledged that a substantial tax increase was necessary; however, they disagreed on the gross amount of the increase. The issue, according to these legislators, was not whether there would be a tax increase, but the necessity of a particular amount. Each scenario envisioned a several hundred million dollar tax increase. The impasse continued even though the writ petition was pending. The Legislature recessed at the call of the majority leaders of both houses.

With the beginning of the new fiscal year came an imminent and grave crisis, caused by the Legislature's failure to complete its constitutional duties. Particularly at risk was Nevada's K-12 public education system. The school districts' window for recruiting high quality teachers to comply with the No Child Left Behind Act was closing. Anticipating vacant teaching positions, school districts were eliminating special education programs. Both prospective and current teachers began to question their employment in Nevada. The lack of a balanced budget was also not without serious consequences, as it threatened Nevada's bond rating.

This unprecedented crisis arose because of the two antagonistic constitutional provisions with which the Legislature is saddled. Article 4, Section 18(1) requires only a simple majority to enact appropriations bills, but Article 4, Section 18(2) requires a supermajority to generate or increase public revenue to fund those appropriations. That these provisions occupy antagonistic positions was apparent from the various respondents' conflicting interpretations. The counter-petitioners argued that the supermajority provision for generating public revenue trumps Section 18(1)'s requirement that all other bills, including appropriations, be passed by a simple majority whenever the appropriations call for a tax increase. According to these legislators, the general appropriations bill, passed by a majority of the Legislature, was void because it was not passed by a two-thirds supermajority. The respondent Legislature, on the other hand, asserted that the minority legisla-

tors' interpretation frustrates the plain language of Section 18(1). According to the Legislature, "it is evident that [the supermajority] provision does not require a two-thirds vote in regard to a legislative measure which appropriates money, but which does not actually create, generate, or increase public revenue." Faced with these differing views on the supermajority requirement's application, it became our task, as the ultimate custodians of constitutional meaning, to balance Sections 18(1) and 18(2) so as to preserve and credit both clauses to the maximum extent possible.[21]

In construing the Constitution, our primary objective is to discern the intent of those who enacted the provisions at issue, and to fashion an interpretation consistent with that objective.[22] However, when the enactors' intent cannot be determined, rules of constitutional construction require us to attempt to harmonize differing provisions so as to give as much effect as possible to each provision.[23] We look beyond the plain language of constitutional provisions to ascertain intent "when a construction is urged which would result in an absurd situation"[24] or when provisions are subject to conflicting interpretations.[25]

The language of Article 4, Section 18(1) and Article 4, Section 18(2) is clear on its face. But in operation, the two provisions resulted in legislative paralysis in one general and two special sessions. The parties advanced conflicting interpretations of the provisions' requirements. We thus looked to extrinsic evidence surrounding the supermajority provision's enactment to determine its intended effect.

As mentioned earlier, Article 4, Section 18(2) originated as Ballot Question 11 during the 1994 and 1996 general elections. The supermajority requirement was intended to make it more difficult for the Legislature to pass new taxes, hopefully encouraging efficiency and effectiveness in government. Its proponents argued that the tax restriction might also encourage state government to prioritize its spending and economize rather than explore new sources of revenue. But neither the ballot question nor its expla-

[21]See Marbury v. Madison, 5 U.S. 137, 178 (1803); State v. Rosenthal, 93 Nev. 36, 41, 559 P.2d 830, 834 (1977); Zaner v. City of Brighton, 917 P.2d 280, 283 (Colo. 1996); Denish v. Johnson, 910 P.2d 914, 922 (N.M. 1996).

[22]Nevada Mining Ass'n v. Erdoes, 117 Nev. 531, 538, 26 P.3d 753, 757 (2001); accord In re Anthony R., 201 Cal. Rptr. 299, 302 (Ct. App. 1984).

[23]Bowyer v. Taack, 107 Nev. 625, 627, 817 P.2d 1176, 1177 (1991); Ex parte Shelor, 33 Nev. 361, 375, 111 P. 291, 293 (1910).

[24]Bussanich v. Douglas, 733 P.2d 644, 647 (Ariz. Ct. App. 1986).

[25]See Soto v. Superior Court, 949 P.2d 539, 544 (Ariz. Ct. App. 1997); Utah School Boards v. State Bd. of Educ., 17 P.3d 1125, 1129 (Utah 2001); cf. Cook v. Maher, 108 Nev. 1024, 842 P.2d 729 (1992) (resolving conflicting constitutional interpretations).

nation in the voter pamphlet informed voters of the likelihood of legislative paralysis and its effect on the state's fiscal and educational integrity. Indeed, even the initiative's prime sponsor was unsure of the consequences of reposing within a small group of legislators the power to block majority-approved appropriations. And, in 1993, he represented to the Assembly that the supermajority requirement "would not hamstring state government or prevent state government from responding to legitimate fiscal emergencies."[26]

The voters were not privy to the Assembly's concerns that culminated in the requirement's legislative rejection, and the requirement's proponents failed to address those concerns when presenting the initiative. Because the voters were not informed of the problems the amendment would cause if a minority of legislators disagreed with the majority over the level of services to be provided to Nevada citizens, we could not determine how the voters intended to resolve such a conflict.[27]

We were persuaded that the Legislature's view of the Constitution's plain language was correct. A simple majority is necessary to approve the budget and determine the need for raising revenue. A two-thirds supermajority is needed to determine what specific changes would be made to the existing tax structure to increase revenue. Consequently we rejected the counter-petitioners' interpretation and dismissed the counter-petition.

However, our dismissal of the counter-petition could not, standing alone, resolve the impasse. While we could direct the legislators to proceed with their constitutional duties to pass a balanced budget and fund education, we had no ability to enforce the order. Under the separation of powers doctrine, individual legislators . cannot, nor should they, be subject to fines or other penalties for voting in a particular way.[28] Additionally, we could not, nor did we, direct the Legislature to approve any particular funding amount or tax structure.[29] This does not mean, however, that no other remedy

---

[26]Hearing on A.J.R. 21 Before the Assembly Comm. on Taxation, 67th Leg. (Nev., May 4, 1993).

[27]As we noted in our prior opinion, the initiative measure included a provision that permits a majority of the Legislature to refer any proposed new or increased taxes for a vote at the next general election. The voter information, however, did not indicate that this language was included to resolve a budget impasse. Nor could this provision, Article 4, Section 18(3), realistically resolve a budget impasse. As the Legislature meets every other year in odd-numbered years for only 120 days, and general elections are held only every other year in even-numbered years, the voters could not intervene for sixteen months. *See* Nev. Const. art. 4, §§ 2(1), 2(2); NRS 293.12755.

[28]*See Supreme Court of Va. v. Consumers Union,* 446 U.S. 719, 731 (1980); *Gravel v. United States,* 408 U.S. 606, 616-18 (1972); *Yeldell v. Cooper Green Hosp., Inc.,* 956 F.2d 1056, 1062 (11th Cir. 1992).

[29]Annotation, *Mandamus to Members or Officer of Legislature,* 136 A.L.R. 677 (1942).

exists to resolve a constitutional crisis created by the Legislature's inability, as a whole, to fulfill its constitutional obligations. In this instance, the minority's refusal to accept the majority's duly passed budget decisions meant that the constitutional requirements to fund public education and balance the budget remained unfulfilled.

In his initial pleadings, the Governor cited to law in other jurisdictions with similar educational constitutional provisions. Courts of those states had assigned high priority to these provisions when their legislatures failed to fulfill their constitutional duties to fund public education. Some amicus briefs urged us to declare the two-thirds majority requirement unconstitutional, as it interfered with the Legislature's ability to fulfill its duty to fund education and balance the budget. At the very least, those amici urged the court to suspend operation of the two-thirds requirement in this session. Other amicus briefs argued against this proposition. Because the impasse was substantial, impairing educational functions, and because we discerned that the supermajority requirement was not created to avoid the Legislature's constitutional duties to fund public education and balance the budget, we considered these arguments.

When a court is faced with conflicting policies arising out of multiple constitutional provisions in a specific factual situation, it must, if it can, strike a balance between the provisions. Conflict avoidance and resolution measures employed in First and Sixth Amendment jurisprudence demonstrate this fact. For instance, tension is continually present between the Establishment Clause and the Free Exercise Clause of the First Amendment.[30] One clause prohibits actions that might constitute the establishment of religion, while the other clause guarantees the right of all to be free to follow their religious preferences. Rather than rigidly enforce either provision, the United States Supreme Court has found in the constitutional machinery "play in the joints" in an effort to strike a balance between them.[31] This rejection of rigid constitutional doctrine is necessary to honor the "transcendent value of free religious exercise in our constitutional scheme," and extends, for example, "to the extent of cautiously delineated secular governmental assistance to religious schools, despite the fact that such assistance touches on the conflicting values of the Establishment Clause by indirectly benefiting the religious schools and their sponsors."[32]

[30]*See Tilton v. Richardson,* 403 U.S. 672, 677 (1971) (plurality opinion). A tension exists because, as Justice Brennan once noted, "There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain religious liberties also protected by the [Free Exercise Clause]." *Abington School Dist. v. Schempp,* 374 U.S. 203, 296 (1963) (Brennan, J., concurring).

[31]*Norwood v. Harrison,* 413 U.S. 455, 469 (1973); *Walz v. Tax Commission,* 397 U.S. 664, 669 (1970).

[32]*Norwood,* 413 U.S. at 469.

Similarly, where freedom of the press[33] may jeopardize a criminal defendant's right to a fair trial,[34] the High Court permits restrictions on trial publicity.[35] The Supreme Court has stated that "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information."[36]

In reconciling the competing provisions of Nevada's constitutional requirements to fund education and balance the budget with the supermajority requirements for changing the tax structure, we believed that the appropriate analysis required weighing the interests protected by each provision, under the specific facts of this case, to determine whether the net benefit that accrued to one of those interests exceeded the net harm done to the other.[37] The essential issue was whether the supermajority requirement could be improperly used by a few to challenge the majority's budget decisions, thereby preventing the Legislature from performing its other constitutional duties.

The primary interest supported by permitting the Legislature to suspend the supermajority requirement in this case was nothing less than the constitutional mandate to fund public education. The United States Supreme Court fifty years ago stated:

> [E]ducation is perhaps the most important function of state and local governments. . . . [Education] is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.[38]

This statement is equally pertinent today. "No other governmental service plays such a seminal role in developing and maintaining a citizenry capable of furthering the economic, political, and social viability of the State."[39] Our State Constitution's framers explicitly

---

[33]U.S. Const. amend. I.

[34]*Id.* amend. VI.

[35]*Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 562 (1976) (quoting *United States v. Dennis,* 183 F.2d 201, 212 (2d Cir. 1950) (internal quotation marks omitted)).

[36]*Waller v. Georgia,* 467 U.S. 39, 45 (1984).

[37]*See Bender v. Williamsport Area School Dist.,* 741 F.2d 538, 559 (3d Cir. 1984), *vacated on other grounds,* 475 U.S. 534 (1986).

[38]*Brown v. Board of Education,* 347 U.S. 483, 493 (1954).

[39]*Claremont School Dist. v. Governor,* 703 A.2d 1353, 1356 (N.H. 1997).

and extensively addressed education,[40] believing strongly that each child should have the opportunity to receive a basic education.[41]

In addition, we were necessarily concerned with the interest of preserving the democratic process. A majority of legislators, representing a majority of the citizens of this state, make decisions on the services to be provided and the future of the state. These include what programs to provide for children, the disabled and senior citizens; the construction and repair of roads and streets; funding of agencies to protect our citizens from telemarketing schemes or fraudulent transactions; costs associated with law enforcement activities; and staffing and location of state offices to avoid delays or long distance travel to obtain necessary documents such as drivers' licenses, vehicle or corporate registrations. Where these matters have been discussed and duly voted upon, the Constitution requires that the decision of the majority be respected.

Against public education, the democratic process and fiscal interests, we balanced the interests fostered by the supermajority requirement. The two-thirds requirement was intended, according to the information supplied to the voters in the 1994 and 1996 elections, to limit the influence of special interest groups, ensuring that one group would not control changes in the tax structure. The voter pamphlet also indicated that the amendment might promote more efficiency in government. These interests are legitimate and important, but they do not outweigh the need to fund education or abide by the majority rule mandated by Article 4, Section 18(1). To avoid an impasse harmful to public education, we determined that the supermajority provision could not be improperly used to avoid majority rule on budget appropriations. Accordingly, we held that the Legislature could suspend the supermajority rule in favor of a vote by a legislative majority, in this very narrow circumstance, in order to fulfill its obligations to fund education and balance the budget.

Resolution of the impasse was entirely in the hands of the Legislature. If the minority abided by the Constitution and recognized that majority rule controlled budget appropriations issues and

---

[40]*See* Nev. Const. art. 11, § 1 ("The legislature shall encourage by all suitable means the promotion of intellectual, literary, scientific, mining, mechanical, agricultural, and moral improvements, and also provide for a superintendent of public instruction and by law prescribe the manner of appointment, term of office and the duties thereof."); *id.* art. 11, § 2 ("The legislature shall provide for a uniform system of common schools, by which a school shall be established and maintained in each school district at least six months in every year . . . and the legislature may pass such laws as will tend to secure a general attendance of the children in each school district upon said public schools."); *id.* art. 11, § 6 ("In addition to other means provided for the support and maintenance of said university and common schools, the legislature shall provide for their support and maintenance by direct legislative appropriation from the general fund . . . .").

[41]*See Debates & Proceedings, supra* note 2, at 567-72.

thus the need to generate an amount of revenue, the impasse would end and the only issue remaining, what changes to make in the revenue structure to achieve a balanced budget, would proceed by the two-thirds supermajority. This is, in fact, what happened. After our decision, the majority made concessions on the budget. Although some legislators would still have preferred additional cuts, they recognized that the Constitution required them to abide by the majority's decision and move on to determine how to balance the budget. Two-thirds of the members of both houses of the Legislature then approved the tax changes necessary to balance the budget. Our opinion did not eliminate the two-thirds requirement, but it did indicate that the supermajority provision could not be used to avoid other constitutional duties.

In the petition for rehearing, counter-petitioners take an abrupt about-face on interpreting the Nevada Constitution. For, although they strenuously argued in their counter-petition that the two-thirds supermajority provision necessarily predominated over the simple majority provision governing appropriations, and that the legislative appropriations made during the regular session were therefore void, they now argue, for the first time, that a construction permitting one provision to yield to another necessarily results in vote dilution. Yet counter-petitioners' proffered construction of the Constitution, if followed, would also result in vote dilution, according to counter-petitioners' own reasoning.

We do not reach these issues, however, because we determine that the petition for rehearing became moot when the Legislature passed the revenue-generating bills by the requisite two-thirds vote. We have consistently iterated that our duty "is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles of law which cannot affect the matter in issue before [us]."[42]

In this case, once the Legislature adopted revenue-raising legislation by a two-thirds supermajority in order to fund the public school system and balance the state's budget, the rehearing petition became moot. And, although we recognize an exception to the mootness doctrine for issues capable of repetition yet evading review, the issues raised in the rehearing petition are not subject to this narrow exception.[43] As the United States Supreme Court has noted, to evade review, the challenged action must be too short in

[42]*NCAA v. University of Nevada*, 97 Nev. 56, 57, 624 P.2d 10, 10 (1981).

[43]*See, e.g., Langston v. Nevada*, 110 Nev. 342, 344, 871 P.2d 362, 363 (1994).

its duration to be fully litigated before its cessation or expiration.[44] If the Legislature were to increase or raise taxes in the future under simple majority rule, this court would have ample opportunity to review that action.[45]

The two-thirds supermajority provision, as passed, created the potential for an absolute budgetary stalemate in the Legislature; that potential was realized this year and has done significant damage to public education. A judicial resolution of the constitutional conflict was necessary, so that the Legislature could perform its constitutionally mandated duties. Our prior opinion did just that. We dismiss the rehearing petition.[46]

SHEARING, J., concurring:

I would simply deny the petition for rehearing.

Rule 40(c) of the Nevada Rules of Appellate Procedure sets forth the standards for the content of a petition for rehearing as follows:

> (1) Matters presented in the briefs and oral arguments may not be reargued in the petition for rehearing, and no point may be raised for the first time on rehearing.
>
> (2) The court may consider rehearings in the following circumstances:
>
> (i) When the court has overlooked or misapprehended a material fact in the record or a material question of law in the case, or
>
> (ii) When the court has overlooked, misapplied or failed to consider a statute, procedural rule, regulation or decision directly controlling a dispositive issue in the case.

This petition for rehearing is not appropriate under any of these provisions. The petition reargues matter previously considered and presents new matter not previously argued. Petitioners have not demonstrated to the court that the court has overlooked or misapprehended any material fact or material question of law. Neither have the petitioners demonstrated that the court has overlooked, misapplied or failed to consider a statute, procedural rule, regulation or decision directly controlling a dispositive issue in this case.

---

[44]*Weinstein v. Bradford,* 423 U.S. 147, 149 (1975).

[45]We reject counter-petitioners' attempt to avoid the mootness bar under the exception that voluntary cessation of unconstitutional conduct will not prevent review. To the extent that counter-petitioners suggest that the Legislature's passage of revenue-raising legislation constitutes unconstitutional conduct, that suggestion is absurd. And to the extent counter-petitioners assert that the Legislature's voluntarily ceased "unconstitutional conduct" was passing revenue-raising legislation by a simple majority vote, there was no such conduct.

[46]We deny counter-petitioners' motion to vacate as well as their emergency stay motion.

The petitioners are additionally requesting new relief. Since the petition for rehearing does not conform to the appropriate standards, it must be denied.

I do not agree that it is appropriate, in responding to a petition for rehearing, for this court to attempt to answer public criticism of this court's decision or to criticize the Constitution or laws of this state. We must accept the duly enacted Constitution and laws of this state, whether they are well advised or ill advised; the court's duty is to decide the cases brought before it. Often that duty involves trying to reconcile provisions that, in practical application, produce results that are incompatible with one another. The court has accomplished that reconciliation in this case. That should end the matter.

MAUPIN, J., dissenting:

The rehearing petition in this matter should be granted, the writ of mandamus dissolved and the prior majority opinion vacated. First, the Nevada State Legislature completed its work without resort to the remedy afforded by this court in the writ. It ultimately complied with the Nevada Constitution as written by appropriating funds for the state educational system and creating the new revenue sources to pay for the appropriations by a two-thirds vote.[1] Second, the perceived crisis the majority sought to address in the writ was averted by the legislative action just mentioned. Third, the majority now indicates that the original decision had discrete application to the limited circumstances of the 2003 legislative sessions; thus a need for precedent for future sessions does not exist. Accordingly, the entire matter is moot.

I most strongly take issue with the court's comments on rehearing that the supermajority initiative was flawed from its inception and that the Nevada electorate twice approved it without an understanding that a stalemate between appropriations and taxes could eventuate. The initiative was vetted through two elections and we should not from this vantage point presume to say what the voters of this state knew or did not know. In any case, the potential for such a conflict was inherent in the proposal and the people of this state had every right to make it more onerous for the Legislature to create new revenue streams for the operation of government. Nothing in this constitutional construct prevents the Legislature

---

[1]The Nevada State Constitution requires that the State Legislature appropriate sufficient funds to support and maintain the public school system; that it provide for sufficient revenues to balance the state budget; and that any increases in taxes to fund the state budget be approved by a supermajority of both houses of the legislature. *See* Nev. Const. art. 11, § 6; *id.* art. 9, § 2(1); *id.* art. 4, § 18(2). The writ, as noted by the majority on rehearing, allowed the 2003 Legislature, in special session, to create new funding sources by a simple majority rather than a supermajority to resolve an impasse in arriving at a balanced budget that existed as of July 10, 2003.

from crafting a balanced budget and, as noted, the Legislature ultimately complied with the supermajority requirement.

We need look no further than the second paragraph of the Declaration of American Independence for sustenance in any judicial analysis of initiative petitions passed by a vote of the people:

> We hold these truths to be self-evident, . . . [t]hat . . . governments are instituted . . . , deriving their just powers from the consent of the governed . . . .

This court did not invalidate the tax initiative as somehow being unconstitutional. Having thus affirmed its basic validity, we must recognize that such initiatives, however inconvenient to the operatives of government they may be at times, represent the ultimate form of citizen consent to government. Accordingly, it is not for us, the supreme court of this state, to criticize the wisdom of a valid initiative embraced by an overwhelming majority of Nevadans.

I am therefore of the belief that we should, in response to the petition for rehearing, vacate the writ of mandamus and the prior opinion issued in aid of it.